469 So.2d 1191 (1985)
Earl BUNCH, Jr., Plaintiff-Appellant,
v.
Alice Marie BUNCH, Defendant-Appellee.
No. 84-440.
Court of Appeal of Louisiana, Third Circuit.
May 15, 1985.
*1192 Salter, Streete and Hale, Steven W. Hale, Lake Charles, for plaintiff-appellant.
Cox, Cox, Townsley and Fowler, Terry D. Fowler, Kirby, Lake Charles, for defendant-appellee.
Before GUIDRY, FORET and KNOLL, JJ.
GUIDRY, Judge.
This is a child custody case. The trial court awarded the pendente lite custody of eight year old Angela Michelle Bunch to both parents jointly, with the legal domicile of the child designated as that of the mother, Alice Marie Bunch. Earl Bunch, Jr., the child's father, appeals from that judgment.
Earl Bunch filed suit for a legal separation from his wife on April 26, 1983, alleging mental cruelty. In his original petition, he conceded that custody of their only child should be awarded to Mrs. Bunch subject to his right of visitation. He later amended his petition, seeking sole custody of Angela Michelle or, alternatively, joint custody. Mrs. Bunch reconvened alleging cruel treatment and abandonment by Mr. Bunch. Mrs. Bunch additionally petitioned for alimony, child support, and sole custody of Angela Michelle.
At the hearing on the rule for child support and alimony, the parties stipulated that Mr. Bunch would pay $300.00 per month in child support and a $700.00 lump sum in payment of alimony pendente lite. The parties also stipulated to the temporary joint custody of Angela Michelle pending judgment on the custody rule.
On February 21st and 27th of 1984, evidence was adduced on the issue of pendente lite custody of Angela Michelle. After a thorough and extensive hearing, the trial judge rejected both parties' requests for sole custody and entered an order of joint custody. The trial court designated the legal domicile of Angela Michelle to be that of Mrs. Bunch, with specific visitation rights granted to Mr. Bunch.
Mr. Bunch contends on appeal that, in view of the overriding issue of Angela Michelle's safety, the trial court erred in refusing to grant him the sole custody of his daughter or, alternatively, in refusing to designate the legal domicile of Angela Michelle with him.

FACTS
The parties were married on February 9, 1968, at Fort Polk, Louisiana. Mr. Bunch was serving in the Army at the time. Mrs. Bunch was eighteen years old. On September 18, 1968, Mrs. Bunch gave birth to a son, Earl Dwayne Bunch. Shortly thereafter, Mr. Bunch was transferred overseas and stationed in Thailand. Mrs. Bunch and Earl Dwayne moved to Sulphur, Louisiana, where they lived with Mr. Bunch's parents. Mrs. Bunch later moved with Earl Dwayne to a rent house next to her in-laws.
While in Thailand, Mr. Bunch received a series of letters from Mrs. Bunch which expressed her despair and loneliness. The letters were of a threatening nature, both towards herself and her son. The following are excerpts from those letters written by Mrs. Bunch to Mr. Bunch during the latter part of 1969.
November 4, 1969:
"... I just got through whipping that little basdard (sic). I hate him. That's the honest truth. I can't stand this life. God had to punish me by letting me have that little brat. I wish I would have died when he was born. I hate myself. Do you think I'll ever be happy? Now I *1193 know how those people feel that get rid of their kids. I believe I could do it. I'm serious ..."
November 19, 1969:
"... I don't want to be a mother. I never did and that is why I said God punished me.... Doozer (Earl Dwayne) is (sic) got to where he is always whining when we go to your mother's. I hate to take him over there. I honestly wish he had never been born. He knows he won't get his way around me. I'll kill him before he becomes spoilt. I honestly mean that ..."
November 21, 1969:
"... If he (Earl Dwayne) starts crying when I put him down to play, I'm going to whip him until his darn seat is red. I can't put up with this mess ... I hate your son. I wish he was dead ..."
December 9, 1969:
"... I hate every damn body except you. You're the only one in this whole world. Nothing else matters expect (sic). Duane (sic) doesn't even mean anything to me anymore. What is wrong with me darling. I should love my own son but I really don't think I do and if I did I would know it. I feel as if he would die tomorrow I wouldn't care. I can't help it. To me he is the one who ruint (sic) my life. I mean what do I do he's a person. He needs love but I can't give it to him. Help me. What do I do ..."
December 22, 1969:
"... I want to be some place where I don't have to give an explanation for things I do and where people mind their own business. You know who I'm talking about. A person can get tired of hearing it. I've heard what to do with Earl Duane (sic) so much that I don't even care to do anything with him. I got to where I hate him. I can't help it. I wish I had never had him ..."
Mr. Bunch testified that he had received similar alarming letters from his wife in March and April of 1969, although he was unable to find them at the time of the hearing. He testified that he tried to return to Louisiana on an emergency leave in order to comfort his wife, but was unable to obtain one. He called his wife around that time and tried to calm her down and wrote her every day in an attempt to cheer her up.
On January 19, 1970, Mrs. Bunch took Earl Dwayne to the emergency room of West Calcasieu-Cameron Hospital in Sulphur. Earl Dwayne was limp and gasping for breath. He was immediately transferred to Lake Charles Memorial Hospital where he was x-rayed. The x-rays revealed multiple fractures of the skull and right shoulder. Earl Dwayne was thereafter transferred to St. Elizabeth's Hospital in Beaumont, Texas. He died the following morning during emergency craniotomy surgery. An investigation was conducted by the Calcasieu Parish Sheriff's Office. No arrest or charges were levied against Mrs. Bunch as a result of the investigation.
Mr. Bunch returned home from Thailand for his son's funeral. Upon his return, he questioned his wife as to the cause of Earl Dwayne's death. Mrs. Bunch denied having harmed her son and stated that he had probably fractured his skull when he fell out of bed at his grandmother's house in New Orleans a few weeks prior to his death. Mr. Bunch then spoke to authorities at the Sheriff's Department who also gave him no reason to believe that Earl Dwayne's death was anything but accidental. Mr. Bunch did not inform anyone of the contents of the letters which he had received from Mrs. Bunch. He testified that he accepted his son's death as accidental, because he could not believe that the woman he loved could have harmed her own son.
In December of 1970, Mr. Bunch was released from the Army. He and Mrs. Bunch moved to Ashville, North Carolina, where Mr. Bunch obtained employment at a T.V. repair shop. In 1971, he changed jobs and started working for Fishburne Equipment Company as an electrician. His job required that he travel extensively, sometimes for two to three weeks at a time. He spent three months in Canada in *1194 1974 and three months in Greece in 1976. Mrs. Bunch would accompany him on some of these trips.
Angela Michelle was born on June 14, 1975. Mrs. Bunch and Angela Michelle joined Mr. Bunch in Greece in 1976 for three months. Mr. Bunch made two other business trips overseas alone.
In 1978, the Bunch family moved back to Calcasieu Parish. Mr. Bunch went to work for Olin Chemical Company as a maintenance electrician, where he is still presently employed at an annual salary of $33,000.00.
Due to marital discord and disharmony, Mr. Bunch left the matrimonial domicile on April 26, 1983 and filed a petition for separation. In his petition, he agreed to Mrs. Bunch's retention of sole custody of Angela Michelle with reasonable visitation rights. Shortly thereafter, Mrs. Bunch began questioning Mr. Bunch as to the whereabouts of the letters she had written to him while he was overseas. These questions aroused Mr. Bunch's suspicions. He found the letters and re-read them for the first time in thirteen years. Mr. Bunch's concern for the welfare of his daughter prompted him to further investigate the incidents surrounding his son's death.
Mr. Bunch contacted Dr. J.M. Thorkelson, the physician who examined Earl Dwayne at West Calcasieu-Cameron Hospital on January 19, 1970, with regards to the cause of his son's death. Dr. Thorkelson stated that Earl Dwayne was brought into the hospital in a comatose condition. He observed multiple bruises over his body, most severely in the area of his right shoulder. Palpation of his head indicated that Earl Dwayne had additionally experienced skull fractures. Dr. Thorkelson also noted bite marks on Earl Dwayne's body and a burn mark on his buttocks. Dr. Thorkelson's summation at trial of Earl Dwayne's condition is as follows:
"These were not the type of injuries I would have expected to see from a fall from a crib, for example, or a porch, or something like that, where you get a fairly severe injury. It looked more like a child that had been beaten; that perhaps somebody had taken it by the feet, and swung it against a piece of furniture or the wall."
Dr. Thorkelson also noted that Mrs. Bunch was not hysterical at the time, as he would have expected. Instead, Mrs. Bunch stood quietly in a corner, showing little or no emotion at all. He described her emotional state as "stoical".
An autopsy was performed on Earl Dwayne on the date of his death by Dr. Howard R. Wilcox, Jr., revealing the following:
(1) Multiple contusions and ecchymoses of skin
(2) Subdural hemorrhage, right hemisphere
(3) Subarachnoid hemmorrhage
(4) Status post-operative trephination of calvarium, bilateral
(5) Pneumonitis
(6) Emphysema of lungs, traumatic
Out of fear for Angela Michelle's safety, Mr. Bunch thereafter amended his petition for separation to seek the sole custody of his daughter or, alternatively, joint custody. He also requested that Mrs. Bunch submit to a psychiatric examination by Dr. Gilles R. Morin. Angela Michelle was taken to Dr. Thorkelson by her father for a complete physical examination. Dr. Thorkelson found Angela Michelle to be in good health and without any evidence of prior child abuse.
Mrs. Bunch was examined by Dr. Harper F. Willis, psychiatrist and neurologist, on July 20, 1983. Dr. Willis gave Mrs. Bunch a psychiatric examination as well as the Minnesota Multiphasic Personality Inventory (M.M.P.I.). Dr. Willis observed that, although Mrs. Bunch was moderately depressed over the termination of her marriage, she did not show any type of psychotic characteristics. Mrs. Bunch denied all charges of child abuse and showed a sincere concern about losing her daughter. The results from the M.M.P.I. showed that Mrs. Bunch was an extremely dependent individual; moderately suspicious and impulsive; *1195 and, without any visible signs of neurosis or psychosis.
Dr. Willis again examined Mrs. Bunch in January of 1984. He found that she was not as dependent as she had been on her previous examination. She also did not exhibit any real marked signs of depression. Dr. Willis felt that Mrs. Bunch was more in control of herself and was adjusting well to her recent move to Jackson, Louisiana. Dr. Willis concluded that he did not consider Mrs. Bunch to present any danger to her daughter. He noted a very positive relationship between Mrs. Bunch and Angela Michelle.
Dr. Willis also examined Angela Michelle in January of 1984. He performed a T.A.T. test on her, which involves a series of pictures being shown to a child and they are asked to relate a story to each picture. Dr. Willis stated that it is through this test that he would determine whether a child has been a victim of child abuse. The T.A.T. test results revealed that Angela Michelle was a relatively well-adjusted child. She exhibited a fear of not being able to see the parent whom she would not be awarded to. She expressed a love and concern for both of her parents. There was no evidence that Angela Michelle was either afraid of personal injury or that she had been physically abused. When asked what three wishes she would like to have granted to her, Angela Michelle stated:
"(1) For mom not to have any problems trying to get me;
(2) To let it work out all right; and
(3) For mom to get me forever."
When discussing her dreams with Dr. Willis, Angela Michelle expressed a fear that her father would steal her away.
Dr. Willis examined the letters written by Mrs. Bunch in 1969 and expressed his opinion that the letters are very suggestive of a person who was going to commit child abuse. He concluded that Mrs. Bunch, an eighteen-year-old newly married mother away from her spouse and his emotional support, who was impulsive and dependent, could certainly have committed child abuse as a result of her stressful situation. Dr. Willis commented that he could not completely rule out the possibility that Mrs. Bunch is capable of child abuse today.
On July 28, 1983, Mrs. Bunch was also examined by Dr. Gilles R. Morin, a psychiatrist in Lake Charles. Prior to the examination, Dr. Morin read copies of Mrs. Bunch's letters of 1969, as well as Dr. Willis' examination conclusions and M.M. P.I. results. Dr. Morin's assessment of Mrs. Bunch's emotional condition was essentially the same as Dr. Willis'. From his clinical examination of Mrs. Bunch, he found that she was not psychotic, although she was somewhat depressed over her recent marriage breakup. From the letters, Dr. Morin surmised that Mrs. Bunch was very distraught, unhappy and threatening in 1969. He felt that Mrs. Bunch's psychological make-up at that period in her life was such that she could have abused her child. However, he concluded that Mrs. Bunch is not the same person that she was back then. Dr. Morin found no evidence that Mrs. Bunch was the type of person that would lose control easily nor did she exhibit any type of aggressive tendencies. He stated that it was possible that if Mrs. Bunch became depressed enough, that she could regress back to her threatening nature, but she would probably only threaten herself and not others. In conclusion, Dr. Morin stated that he could see no reason why Mrs. Bunch could not be an adequate mother towards Angela Michelle. He saw no danger in Mrs. Bunch getting custody of her daughter.
Mr. Bunch testified to various incidents whereby he alleged Mrs. Bunch physically abused their daughter and exhibited acts of violence towards herself and others. Mr. Bunch asserted that in March of 1982, Mrs. Bunch and Angela Michelle got into an argument which resulted in Mrs. Bunch pulling a patch of hair out of her daughter's head. This story was corroborated by the principal of the school which Angela Michelle attended in Sulphur. Angela Michelle's teacher had called to his attention two bald patches on the child's head the size of a fifty cent piece. Mrs. Bunch *1196 admitted that she had pulled her daughter's hair on one occasion, but that she had not pulled the hair out by the roots as Mr. Bunch had asserted.
Mr. Bunch also testified as to other occasions where Angela Michelle had complained to him of her mother either slapping or frightening her. He referred to bruises on Angela Michelle's legs and hips which he claims were the result of his wife's violent temper. Mrs. Bunch admitted that her daughter had bruises on her legs but was unaware of what had caused them. She even took her daughter to a doctor to see if there was something wrong with her blood, but nothing was discovered. Mr. Bunch also claimed that Mrs. Bunch once pulled out a butcher knife and held it to herself, in front of her daughter, threatening to kill herself. Mrs. Bunch denied all of these allegations.
Just prior to their separation in 1983, Mr. Bunch alleges that he and his wife got into an argument which resulted in Mrs. Bunch's departure from their home with a loaded shotgun. He claims that she returned much later, entering the house with the barrel of the gun pointed towards him. Mrs. Bunch admits that she left the house with the gun, but denies ever having pointed it at her husband. She claims that she took the gun simply for attention.
At the time of the hearing, Mrs. Bunch and Angela Michelle had moved to Jackson, Louisiana, in East Feliciana Parish, and were living in a two bedroom mobile home. Mrs. Bunch has several relatives and friends also living in Jackson. She took a real estate course and intends to get a real estate license. Angela Michelle was in the third grade at Jackson Elementary and had made the honor roll on her previous report card. Mrs. Bunch testified that Angela Michelle appears to be happy in Jackson and has made many friends.
Mrs. Bunch was very vague when questioned about the events leading up to her son's death in 1970. She remembered being depressed and lonesome for her husband at that time but denies having ever hurt her son in any way. Mrs. Bunch admitted that the letters were in her own handwriting, but did not recall ever writing them or ever having the feelings expressed in the letters. She stated that she cannot remember having any resentment towards Earl Dwayne. Mrs. Bunch testified that she did not know what caused her son's death but does remember that he fell out of bed at her mother's house on one occasion. She stated that she was shocked about her son's death. She stated that although Earl Dwayne was kind of spoiled, he was never a real disciplinary problem. She also stated that he was always getting bruises. Mrs. Bunch fully co-operated with the Sheriff's Department during their investigation of Earl Dwayne's death. No charges or arrests were ever made in connection therewith.
Louisiana Civil Code Article 146 governs the award of custody of children pending litigation decreeing a separation from bed and board. The article mandates that when both parents are seeking provisional custody of a child of the marriage, the preferential alternative is joint custody if it is in the best interest of the child. Additionally, the burden of proof in showing that joint custody is not in the child's best interest is on the parent seeking sole custody.
The trial judge's discretion in custody matters is entitled to great weight and should not be disturbed on appeal unless a clear abuse is shown. Bourque v. Leger, 322 So.2d 784 (La.App. 3rd Cir.1975), writ refused, 325 So.2d 788 (La.1976); Burch v. Burch, 398 So.2d 84 (La.App. 3rd Cir.1981).
In the instant case, the trial court ordered that joint custody be awarded to both parents. In discussing the reasons for his decision, the trial judge explained:
"First, I do not have the degree of concern over the safety of the child that Mr. Bunch has, and understandably so. I do not minimize the importance of the factor of the child's safety. In fact, I would have to say that I place the physical safety of the child of first ranking in importance. If I felt the evidence was sufficient to show a present real danger *1197 for the child, my decision would not have been as it has been. But I do not feel that the evidence was such that the present danger of the child is a realistic danger. And I felt that had I made that my primary reason, if I were to make Mr. Bunch the custodial parent of the child, I would have been doing so not because the evidence said that I should do so but because of an attitude of, well, I'm just going to play it safe regardless of the consequences, adverse consequences, to the child. In other words, just take the position, well, I'm not going to put myself in a position of having made a decision that involves a risk and not concern myself with what I really thought might be in the best interests of the child and just play it safe and award the physical custody of the child to Mr. Bunch. I did not feel that I could conscientiously do that. Now, the fact that the parties live in different communities causes a problem that I wish was not present. I'm satisfied that Mr. Bunch has a sincere concern concerning the safety and welfare of his daughter. And it is my intention to try to give him as much opportunity for assurance that his child is being properly cared for and also to give the court some reasonable assurance that this is the case. Such would be easier if the parties were living in the same community. But I still think that what I propose to do will be such as to wherewill be sufficient to give Mr. Bunch more of a feeling of comfort that he can be satisfied that the child is being looked after. Now, along that line, one of the things that I hereby do is that I order that the Department of Health and Human Resources supervise the child and the child's home for a period of one year, and to report to the court, to notify the court, at any time that the Department feels that action needs to be taken with respect to the child. I think in this way that both Mr. Bunch and the court can feel more comforted that if things begin to get out of line, which I don't believe they are going to do, that both the father and the court will receive notice of that; and then the court will take appropriate action. I want to emphasize my belief that I do not think any such action is going to be necessary."
The trial judge went on to state that:
"I do feel that the child is well adjusted at the present time; she is doing well in school. The evidence is that she has made friends. I believe it in her best interest to leave the child in the school where the child is presently attending. I don't have the luxury, perhaps, if they were both living in the same community where I could do something a little different about the sharing of the living arrangements of the child with the child attending the same school regardless of which parent the child happened to be living with. I also believe that this young girl needs the unique care that a mother can give to a girl than perhaps a father would be able to. Particularly, I think within a period of a few years that the mother's counseling and advice would better beor can better be given than that of the father. I have explained to the lawyers, and I say so now in open court, that I am impressed with Mr. Bunch's sincerity, his concern for his child. I am satisfied that Mr. Bunch would recognize his responsibilities if the child were living with him, if he were the domiciliary parent, and that he would make a conscientious effort to be a good father to the child. I have made the mother the custodial parent but not for the reason that I do not believe that Mr. Bunch would attempt to be a good custodial parent. I just believe that under all the circumstances the child's welfare would best be served by leaving the child with the mother."
After the submission of plans of implementation for joint custody by both parties, the trial judge decided upon the following visitation rights to be afforded to Mr. Bunch:
1. Three weekends of each month commencing on the first Friday of March, 1984 at 6:00 p.m. and continuing until 6:00 p.m. the following Sunday. All weekend visitation shall commence on *1198 Friday at 6:00 p.m. and end on Sunday at 6:00 p.m.
2. All school holidays except the Christmas-New Year and Thanksgiving holidays of each and every year with the said Christmas-New Year and Thanksgiving holidays to be alternated annually.
3. When one parent is exercising the Christmas-New Year holiday visitation, the other parent shall exercise visitation privileges from the day of the commencement of the school holiday until Christmas Eve afternoon at 4:00 p.m.
4. Summer school vacation commencing one week after the school break until one week prior to the commencement of the following school year. Further, Alice Bunch, during the school summer vacation, shall have the privilege of enjoying a one week visit with the child during the first full week of July and alternative weekends commencing the second weekend after Earl Bunch has physical custody. All weekend visitations shall commence on Friday at 6:00 p.m. and end on Sunday at 6:00 p.m.
At the outset, we note that Mrs. Bunch is not on trial for the death of her son. She was not charged or arrested in connection with Dwayne's death, although the matter was fully investigated. Although the record appears to reflect that Mrs. Bunch was somewhat remiss in the care afforded her deceased son, it is well settled in Louisiana that a custody determination is not to be made simply in order to punish a spouse for past misconduct. Johnson v. Johnson, 331 So.2d 854 (La. App. 1st Cir.1976), writ denied, 334 So.2d 436 (La.1976); Gautreaux v. Allen, 345 So.2d 103 (La.App. 1st Cir.1977). However, past misconduct may form an important consideration in determining present suitability. Gautreaux, supra.
In the instant case, Mrs. Bunch's past treatment of her son is relevant only insofar as it may reflect her predisposition to violence towards Angela Michelle. The trial judge, who was in the best position to judge credibility, obviously believed Mrs. Bunch's testimony that she is not violent or abusive towards her daughter, despite contrary statements made by Mr. Bunch. Much weight was also apparently given to the testimony of the two psychiatrists who examined Mrs. Bunch and opined that she was capable of being a loving and providing mother. The doctors did not observe any reason to fear for Angela Michelle's safety. In fact, Angela Michelle expressed to Dr. Willis a specific desire to remain in her mother's custody.
In view of all of the evidence, we find that neither party has rebutted the presumption in favor of joint custody. We also find no clear error in the trial judge's decision to make Mrs. Bunch the custodial parent. We are reassured of Angela Michelle's continued safety by the fact that the Department of Health and Human Resources will make periodic visits to Mrs. Bunch's home in Jackson. Mr. Bunch is also able to keep a close watch on his daughter considering the indulgent visitation rights afforded him by the trial judge.
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to the plaintiff-appellant.
AFFIRMED.
FORET, J., concurs in the result, but would extend the supervision by the appropriate state agency until the child reaches the age of 16.