548 So.2d 108 (1989)
Barbara Ann Ferguson WEEMS, Appellant,
v.
Jacky Ray WEEMS, Appellee.
No. 20680-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1989.
Rehearing Denied September 21, 1989.
Singer, Boothe & Dean by Samuel T. Singer, Winnsboro, for plaintiff/appellant.
S.E. Lee, Jr., Winnsboro, for defendant/appellee.
*109 Before FRED W. JONES, Jr., NORRIS and LINDSAY, JJ.
NORRIS, Judge.
The mother, Barbara Underhill (formerly Weems), appeals a judgment in rule that amended a prior joint custody order by making the father, Jacky Weems, the primary domiciliary parent. For the reasons expressed, we reverse and render.
The parties were married in early 1980 and had two children, Brandy and Chris, ages seven and four at the time of the instant hearing. Barbara sued for separation in July 1987, alleging cruel treatment and abandonment. Jacky reconvened in January 1988, seeking a divorce on grounds that Barbara had been engaged in an adulterous affair with a man named Tony Underhill in Denton, Texas for several months. He alleged that he and Barbara attempted to reconcile for about two weeks in December 1987 but at the end of that time Barbara left with Tony Underhill and took the children by force. A trial was held on January 28, 1988, after which the court granted Jacky a final divorce. The court's joint custody order provided, inter alia:
(1) The children were to be returned to Franklin Parish and Brandy re-entered in the Baskin School System.
(2) Barbara was to return to Franklin Parish, Louisiana and not to consort or associate with Tony Underhill or any other man in the company of the children; Jacky was not to consort with or live with any females during the time he had custody of the children.
(3) Barbara was to be the primary domiciliary parent, with custody "actually during the full school term."
(4) Jacky was to have custody "during the summer months when the children are out of school."
(5) There were provisions for visitation on odd weekends and holidays; and Jacky was to pay child support while Barbara had custody.
From the time of the first trial until late May 1988, the parties reasonably complied with the order. Around the last day of school, however, when she was supposed to transfer custody to Jacky, Barbara collected the children and took them to Texas, where she was now living with Tony Underhill, whom she had married on May 20. Barbara had never advised Jacky that she intended to take this action; when he went to pick up the children at Barbara's mother's house on May 27, they were not there. Barbara's mother finally admitted, after Jacky summoned a sheriff's deputy, that Barbara had taken them, but insisted she did not know where they went. Over the next few weeks, Jacky repeatedly asked Barbara's relatives for her whereabouts, but no one would tell him. During this time, Barbara never called or wrote.
Jacky filed the instant rule for contempt and to change custody on August 18, 1988. When the matter came up for hearing on September 19, it was the first time he had seen his children all summer.
At the hearing, Barbara admitted that by refusing to let Jacky have custody during the summer she was clearly violating the custody order. She testified, however, that she understood the order to permit her to take the kids out of state if she got married to Tony Underhill. Moreover, she felt justified in taking them without telling Jacky because she "knew" that his girlfriend, Rhonda, was living with him in contravention of the order. Jacky admitted that Rhonda was spending time with him, but denied that she ever spent the night while the children were around. Barbara stated that she was willing to let Jacky have the children pursuant to the order if he would not consort with Rhonda in the children's presence, or if he would marry her; but she learned from her brother-in-law, Eddie Quimby, that Jacky had no intention of marrying her. Eddie did not corroborate this, and Jacky testified that he and Rhonda were engaged.
Barbara testified that Jacky never tried to get in touch with her all summer. She specifically denied that he tried to reach her through Eddie Quimby. However, Eddie testified that Jacky did indeed inquire, "several times," but he always put him off by saying he did not know her exact address *110 in Texas. Barbara testified she could not contact Jacky directly because she was "sure" his phone was disconnected. She added that Jacky knew some of her relatives in Denton (he had served his reconventional demand for divorce at their house), and if he had called them, they would have given him her address.
Barbara testified that between the time of the first trial and late May, she was living with her mother and some other relatives at the mother's house in Baskin. Though the house was large, it was somewhat crowded; Barbara had to share a room with Brandy and Chris. She said she stayed there to comply with the order to keep the children in Franklin Parish. The new home in Texas, according to Barbara, is in a "country" setting and is big enough for each child to have a separate room. When Barbara told the children they had to come back to court, Brandy had some nightmares and Chris got upset. Otherwise the children have adjusted very well to the move and are quite happy in Texas. Brandy "loves" the school in Dallas and has made friends there; Chris is in day care. Although both Barbara and Tony are working, there is no problem with transporting the children and watching them after school.
Jacky testified that he no longer works for the pipeline company (Barbara's claim of abandonment was based on him being away for months at a time on a job in New Jersey). He now works as a mechanic at Classic Chevrolet in Delhi and still lives in the former family home at Crowville, in Franklin Parish. Although he works long hours, his sister-in-law and aunt are willing to help him with child care. Ehonda is living with her mother in Delhi, not with Jacky.
The witnesses testified to numerous arguments and altercations between Jacky and Barbara. Most of these occurred before the original trial so we will not relate them here. What this testimony establishes, however, is that there is much animosity between the parties and their families. Nevertheless, each admitted that the other loved the children and was a good parent toward them.
The trial court delivered oral reasons for judgment. On the issue of contempt, the court found that Barbara's explanation of her actions was essentially an "afterthought" which did not justify defying the custody order. The court found her guilty and imposed a sentence of three months in the parish jail, suspended on condition that she not violate future custody orders, and a fine of $250. The contempt ruling is not appealed.
On the issue of custody the court found that the parties both loved the children and were fit parents. It noted that since the move to Texas, Brandy has had nightmares and Chris is "unstable and unsure of himself." It considered that Barbara's wilful violation of a court order, plus her earlier conduct in taking the children, showed no respect for the law. It also noted that Barbara's acts did not promote the children's interest in maintaining continuing contact with both parents, especially when she seemed to hide them from Jacky. It stressed that the children had spent all their lives in Franklin Parish and, on this basis, they should continue to live there, not in Texas. The court felt that joint custody was still appropriate but it "reversed" and gave primary domiciliary custody to Jacky during the school year and Barbara during the summer, with adjustments to visitation.
Custody of children after divorce is regulated by LSA-C.C. art. 157 and, by implication, art. 146. Joint custody is presumed to be in the children's best interest. After there has been a considered decree of joint custody, a parent seeking to amend the custody order must meet a heavy burden of proof. He must prove a change of circumstances. He must also prove that as a result of the change of circumstances, continuing the present custody is so deleterious to the child as to justify a modification, or prove by clear and convincing evidence that the harm likely to result from a change in environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La. *111 1986); Languirand v. Languirand, 350 So.2d 973 (La.App.2d Cir.1977). In making its determination, the trial court may consider the custodial parent's ability to provide moral guidance for the children. Beck v. Beck, 341 So.2d 580 (La.App.2d Cir.1977). The court may also consider the parent's willingness to facilitate a relationship between the children and the nondomiciliary parent. Martinez v. Martinez, 470 So.2d 374 (La.App.5th Cir.1985), writ denied 472 So.2d 923 (La.1985). However, a custody award should not be granted or denied as punishment for a parent's past misconduct. Bunch v. Bunch, 469 So.2d 1191 (La. App.3d Cir.1985). Removing a child from the court's jurisdiction does not automatically justify modifying an award. Knight v. Knight, 470 So.2d 644 (La.App.1st Cir. 1985); Griffin v. Griffin, 424 So.2d 1228 (La.App.1st Cir.1982). The trial court's factual findings are entitled to great deference. Bergeron v. Bergeron, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
We have examined the evidence and are constrained to conclude that Mr. Weems has not met the heavy burden of proof required by Bergeron.
The trial court relied on three changes which he obviously felt materially affected the children's welfare. These are the mother's remarriage, her removal with the children to Texas, and her violation of the original custody order.
As for the remarriage and the move to Texas, the trial court did not fault Barbara for falling in love, marrying Tony Underhill and moving to his domicile. We would note that she is employed there, whereas she had not worked in Louisiana since September 1987. The only evidence brought out at trial shows that Tony cares for the children and contributes to their support. The evidence does not show any detrimental effect arising solely from Barbara's remarriage.
The chief evidence in support of changed circumstances is Barbara's refusal, on dubious pretexts, to comply with the transfer of custody. Naturally, improper removal or retention of a child contrary to a custody order is not in the child's best interest. Bergeron v. Bergeron, supra. However, the remedies for these transgressions are contempt, criminal proceedings and actions under the Uniform Child Custody Jurisdiction Act, LSA-R.S. 13:1707. Jacky sought these remedies and Barbara was held in contempt and punished accordingly, a portion of the judgment from which she does not appeal. The child does not benefit when custody is changed mainly to punish a parent. In the instant case the trial court also cited Barbara's removal of the children in late December 1987, prior to the first custody order. Admittedly her record is not exemplary but the scenes that occurred before the first custody order were intensified by personality clashes between the parties and their respective family members. Now that Barbara has remarried and moved away, the incidents should be much less frequent. Furthermore, the trial court must have believed Barbara would honor the present court order since it retained joint custody and awarded her custody three months out of the year plus liberal visitation privileges.
The trial court further commented that Barbara's past conduct showed little intent to foster a relationship between the children and Jacky. Barbara testified that if Jacky would comply with the order, she would do likewise. She even offered to "meet him halfway" with respect to visitation. True, Barbara's testimony was sometimes impeached, so the trial court could have chosen not to believe her. However, Barbara carefully complied with the order for several months by keeping the children in Baskin, to the inconvenience of everyone involved. This shows an intent to comply with the order, despite her later violation. The court alluded to the incident in December 1987, but this happened when the parties were in the heat of conflict over a dissolving marriage. The experience of a short period of intense animosity is not the proper measure of compliance; in times of equanimity, Barbara complied with the order.
Finally, there was no evidence adduced whatsoever to show that Barbara's disobedience of the court order had affected or *112 would affect the children adversely. Any conclusion in this regard lacks a factual basis and is mere speculation. Viewed in this light, the facts support retaining the original joint custody order, which made Barbara the primary domiciliary parent.
The trial court felt that moving the children from Louisiana to Texas was detrimental to their welfare. The court specifically cited the need for continuity in the children's lives and stated that subsequent to the move Brandy had experienced nightmares and Chris had become unstable and insecure. Certainly, continuity is an important factor recognized by statute. LSC.C. art. 146C(2)(d). In fact the court stated, "I'm going to keep the kids here. I think that's the best interest of the children." R.p. 156. We have examined whether the record evidence meets the heavy burden of proving that the move materially and adversely affects the children's welfare. In particular, the evidence does not show clearly and convincingly that continuity could be better promoted by keeping the children in Franklin Parish with their father, than by keeping them with their mother (who has provided their care since birth) as the primary domiciliary parent. The uncontradicted evidence shows that the children are happy and well cared for; Brandy has done well in the Texas school and Chris was enrolled in day care. Children this young are probably not "rooted" in the community and will easily adapt to a new surrounding. See R.p. 156.
As for Brandy's nightmares and Chris's insecurity, examination of the record clearly discloses that this evidence was not offered by the party who had the burden of proof; nor was it developed by expert testimony. In fact, the only evidence in this regard was Barbara's testimony. She further explained, however, that Brandy's bad dreams and Chris's insecurity occurred only after they learned of the impending custody battle and that they might have to return to Louisiana to live. This explanation was not contradicted and does not prove, by the appropriate standard, that the move to Texas was detrimental to their welfare. There is really no evidence to suggest that living in Texas is harmful to these children.
In sum, the evidence as to changes cited by the trial court does not satisfy the heavy burden of proof enunciated in Bergeron v. Bergeron, supra. It does not show that the changes have had such an effect on the children that continuing custody with Barbara will be deleterious to them or that changing custody will yield advantages that outweigh the harm of a change. The trial court's conclusion to the contrary is clearly wrong. The judgment of October 5, 1988 must therefore be reversed insofar as it modified the first custody order and made Jacky the primary domiciliary parent. Judgment is rendered as follows:
IT IS FURTHER ORDERED, AJUDGED AND DECREED that joint custody of the minors, BRANDY LEIGH ANN' WEEMS and CHRISTOPHER RAY WEEMS, be and it is hereby awarded to JACKY RAY WEEMS and BABARA ANN WEEMS UNDERHILL, subject to the following conditions:
1. BARBARA ANN WEEMS UDERHILL shall be the primary domiciliary parent and shall have the custody of the minors beginning September 1 through the following May 31 or actually during the full school term.
2. JACKY RAY WEEMS shall have custody of the minors beginning June 1 and ending August 31, it being intended that he have custody during the summer months when the children are out of school.
3. During the period that either party has physical custody, he or she is not to consort with or live with any member of the opposite sex who is not that party's spouse.
4. During the period of custody of either parent, the other parent shall have visitation rights with the children on the first and third weekend out of each month beginning at 6:00 p.m. on Friday and ending on Sunday at 5:00 p.m.
5. During the even years JACKY RAY WEEMS shall have the minors the first week that they are out of school for Christmas. During the odd years he shall have the children during the second week that they are out of school.

*113 6. JACKY RAY WEEMS shall have the minors during the Thanksgiving holidays.
7. JACKY RAY WEEMS shall have the minors during the second half of the spring break from school each year.
8. BARBARA ANN WEEMS UDERHILL shall have the minors on Mothers Day.
9. JACKY RAY WEEMS shall have the minors on Fathers Day.
10. Any other reasonable visitation period that both parties can agree upon shall be implemented.
11. JACKY RAY WEEMS is hereby ordered to pay child support in the amount of THREE HUNDRED AND NO/100 ($300.00) DOLLARS per month for the care and maintenance of the minor children during the months that they are in the custody of their mother, BABARA ANN WEEMS UNDERHILL.
Costs of this appeal are assessed to the appellee, Jacky Ray Weems.
REVERSED AND RENDERED.

ON APPLICATION FOR REHEARING
Before FRED W. JONES, Jr., NORRIS, LINDSAY, SEXTON and HIGHTOWER, JJ.
Rehearing denied.