561 So.2d 875 (1990)
Mark L. MYERS, Plaintiff/Appellant,
v.
Peggy Bingham MYERS, Defendant/Appellee.
No. 21481-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 1990.
Sockrider, Bolin, Nader & Anglin by D. Rex Anglin, Shreveport, for plaintiff/appellant.
Birdia Greer Pitts, Shreveport, for defendant/appellee.
Before HALL, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
In this domestic action, the father, Mark L. Myers, appeals a trial court judgment *876 that modified a prior joint custody arrangement and made the mother, Peggy M. Hebert, the primary custodial parent of their eight year old daughter, Ashley. By three assignments of error Mr. Myers urges the trial court committed manifest error in finding a valid change of circumstances and removing Ashley from the stable environment he had provided for over three years. For the reasons expressed, we affirm.

Facts
The parties were married in August 1979; Ashley was born June 12, 1981; the parties physically separated in May 1985. Later that month Mark filed suit for separation and sole custody; Peggy reconvened, also seeking sole custody; Mark later amended his petition to request a final divorce based on adultery. Mark ultimately obtained the divorce based on adultery, with a finding of mutual fault, by judgment of January 10, 1986 (not filed until July 24, 1986). The judgment was "subject to the joint custody implementation plan attached hereto" but no plan was ever attached or filed. By informal arrangement the parties shared custody by keeping Ashley on alternating weeks; this scheme worked very well for over three years.
In March 1989 Peggy filed the instant rule to change the prior custody arrangement by granting her sole custody or, alternatively, primary domiciliary custody. She had remarried in April 1988 and lived for a few months with her husband, Roger Hebert, in Shreveport. In August 1988, however, Roger moved to Atlanta for a new job with better pay. Peggy had later roomed with a girlfriend to save money until she could join Roger in Atlanta. The purpose of her custody rule was so she could move and take Ashley with her. Mark filed an opposing rule seeking sole custody for himself. He urged that he could maintain the continuity of Ashley's life in Shreveport; he also alleged that Peggy was not fit for sole custody because she physically abused the child, was unemployed and unstable, and could not provide as nice a home environment as Mark.
The rules were consolidated and heard on March 28, May 23 and May 24, 1989. Part of Peggy's evidence dealt with the current home situation for herself and Ashley, and the need to move to Atlanta. She had been sharing a one bedroom apartment with Sandra Smith since January 1989, which made for rather cramped quarters when Ashley was with her. Because she was not working, however, she spent all her time with Ashley. For their support she was using Mark's $75 a month child support plus an allowance from her husband Roger, who was working a lot of overtime to maintain two households. Roger's supervisor, knowing about the situation, had been allowing the excess overtime, but Roger preferred to have the family together and to work regular hours. He was currently living in a one bedroom apartment in Fayetteville, Georgia, but had arranged to move to a larger one when Peggy and Ashley arrived. They planned to start looking for a house in a year or so. Peggy was impressed with the public schools in Georgia; if sole or primary custody were awarded to her, she intended to be a full time mother to Ashley and not take a job until they got settled. She admitted that she did not know much about Atlanta and her only "contact" besides Roger was Roger's brother and his family, who had relocated there sometime earlier.
Another part of Peggy's evidence was to refute Mark's allegations of physical abuse and instability. She denied Mark's claim on direct examination that she pinched Ashley or dragged her around by the hair. She denied locking Ashley in the furnace closet, though she admitted Ashley once got into it while playing hide and seek. It was not intentional on Peggy's part. She and several witnesses, her friends and in-laws, denied that she had a bad temper and violent outbursts. The main allegation stemmed from one occasion when Mark found bruises on Ashley's bottom. He called the Child Protection Agency to investigate; he thought they gave her a "stern warning," but no further action was taken. Peggy admitted she had spanked Ashley that evening, but only because she was uncommonly unruly; Ashley is a bright *877 child and usually well behaved. According to Peggy, the Child Protection worker came and talked with her, but when Peggy informed her there was a pending custody battle, the inquiry ended. Peggy's witnesses testified they had never seen any incident of physical abuse, and in fact they had observed Peggy to be a good parent. Peggy also admitted that she had been unemployed for almost two years and had in fact been fired from two of her last three jobs. She offered explanations, however; for instance, she had responded to a want ad that called only for a "chemist with college" but was fired when the employer learned she had no college degree, just some hours. She liked being able to devote all her time to Ashley. She had moved around a lot, but was trying to economize until she could join Roger in Atlanta. She testified she was faithful to Roger and denied any improprieties in Ashley's presence. Peggy admitted she did not encourage contact between Ashley and members of her own family. She testified without contradiction that she had been sexually abused as a girl by her stepfather; her family, in fact, had "disowned" her when she revealed this to Mark. She appears to have much closer ties with Roger's family. She conceded that Mark was a fit parent, but felt that the move to Atlanta would be in Ashley's best interest.
Peggy called Dr. Robert Minniear, an expert family counselor, who had met with the parties in 1982 and 1984, and with Peggy alone since then. He discussed their social history and said that both parties were good parents. He corroborated Peggy's claims of sexual abuse as a child; as a result, she had nothing to do with her own family, except for a sister.
Mark testified that he was a lifelong resident of Shreveport and had been in a townhouse in Cinnamon Square for almost two years; this is about two miles from Ashley's school and one and a half blocks from his mother. Previously he lived with his mother. He has a degree in marketing from LSU and has worked at McElroy Metals for over six years, where he was recently placed in charge of "inside sales," an 8-5 job with no traveling involved. (Previously, in "outside sales," he had to travel to Texas fairly often.) When he has custody of Ashley, he drops her at school in the morning. His mother picks her up each afternoon and stays with her for two hours or so until he gets home from work. His mother testified that she was perfectly willing to continue taking care of Ashley. According to Mark, Ashley is doing well at school and has friends there, as well as at church and in the neighborhood, not to mention plenty of family. Mark testified that he tries to foster contact between Ashley and Peggy's family; he called Peggy's mother as a witness to corroborate this. He was concerned not to disrupt Ashley's life; he recently turned down a lucrative job opportunity in Atlanta, precisely because he did not want to uproot her. He felt that Peggy should make the same sacrifice on Ashley's behalf. Mark said that Peggy loves Ashley, but he is reluctant to let Ashley stay with her; he felt that a move to Atlanta would be against Ashley's best interest.

Action of the trial court
In oral reasons for judgment, the trial court commended the parties for their cooperation in making the joint custody plan work so well. The court commented that its decision was not easy. The court stated that Peggy "should" move to be with her husband, "if that's what their situation requires." Ashley had indeed received a stable home life but this was as much a result of Peggy's efforts as Mark's, and she has "done a good job." Thus to give custody to Peggy would not be to remove her from an environment she is accustomed to; part of the environment is the parent. The court also noted that visitation would be more difficult if Mark had the child and Peggy had to travel. The court therefore awarded primary domiciliary custody to Peggy, from August 15 of each year until June 15 of the following year. Mark received custody for the two summer months, every spring break, alternate Christmas holidays, and all other reasonable times and places agreed upon, with Mark bearing the cost of Ashley's travel. Child support *878 was set at $350 per month while Peggy had custody, and $150 per month during Mark's custody. Mark assigns as error only the award of primary domiciliary custody to Peggy.

Discussion
Custody of children after divorce is regulated by LSA-C.C. art. 157 and, by reference, art. 146. The primary consideration is always the child's best interest. See art. 146 E. There is considerable jurisprudence as to the heavy burden of proof required to alter a prior, considered decree of custody. See Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). In the instant case the issue of fitness for custody was not considered in the divorce proceeding. Although the trial court at the time entered a pro forma decree of "joint custody," there was no substance to it; evidence was apparently not received and no plan of implementation ever submitted. There was no "considered decree." See Dungan v. Dungan, 499 So.2d 149 (La.App. 2d Cir. 1986); Key v. Key, 519 So.2d 319 (La.App. 2d Cir.1988). The heavy burden of proof of Bergeron does not apply, but the party seeking the change still must show a change in circumstances and that the new custody arrangement would be in the child's best interest. Meredith v. Meredith, 521 So.2d 793 (La.App. 2d Cir.1988); Moore v. Moore, 544 So.2d 479 (La.App. 2d Cir.1989). Stability of environment is a factor to be considered in evaluating a change. Dungan v. Dungan, supra.
There is no question that Peggy's remarriage and imminent move to be with her new husband in Georgia is a change of circumstance sufficient to justify modifying the prior joint custody decree. This court has repeatedly held that when one parent moves out of state, the presumption of joint custody no longer applies; a prior plan may be, but need not be, modified or discarded. Key v. Key, supra; Weems v. Weems, 548 So.2d 108 (La.App. 2d Cir. 1989). The trial court's finding of (or refusal to find) changed circumstances is entitled to great weight. Bergeron v. Bergeron, supra. Under the facts of this case a change was plainly shown and the trial court was not manifestly erroneous in so finding.
The real thrust of Mark's argument, however, is against the trial court's finding that moving Ashley to Georgia with her mother will serve her interest better than keeping her in Shreveport, where she has had a stable environment. In brief, Mark reiterates all the allegations of abuse and instability, implying that Peggy cannot provide a stable home life and Ashley will be at risk living with her. Peggy answers these allegations in brief. The trial court obviously considered Peggy's version of these events more credible and Mark's less. On the evidence presented, we cannot disturb this assessment, even though the cold record might lead us to the opposite conclusion. Rosell v. ESCO, 549 So.2d 840 (La. 1989). The trial court may also have found that even if the allegations were in some measure true, they were too inconsequential to brand Peggy unfit for primary domiciliary custody. Once again, the trial court's assessment of the evidence is entitled to great weight. The trial court heard, just as we now read, Peggy's somewhat exaggerated claim that Ashley is a "free bleeder," as well as the testimony that Ashley could have been accidentally trapped in the furnace closet while a photograph in evidence shows a knob she could have used to get out. The trial court is in a superior position to assess the evidence and we cannot find that these small inconsistencies rise to the level of manifest error. Rosell v. ESCO, supra.
The court aptly noted that the case was difficult. Because of Peggy's move and the demands of the school calendar, any new plan would inevitably create an imbalance, with the lion's share of custodial time going to one party and much less to the other. Aside from the allegations of abuse (which the trial court apparently found unconvincing) and the prayer for stability (which we address below) there was no compelling reason to select one parent over the other. It is a great dilemma for which the law provides no Solomonic solution. Either way, the losing party will be displeased. However, on the basis of this *879 record we can find no grounds for declaring the trial court's solution plainly wrong.
In brief Mark emphasizes and reemphasizes the stability of the environment that Ashley has enjoyed in Shreveport. We concede that the new plan will remove her from a school she has attended for two years and her church. The trial court found, however, that Ashley has spent one half of her time over these formative years with Peggy. Peggy is equally responsible for the stable environment Ashley has enjoyed. In spite of three different addresses over the past few years, Peggy has provided security. She planned not to move Ashley until the current school year was over. The trial court obviously concluded that Peggy stabilized Ashley's environment in the different locales, and would continue to do so after the move to Georgia. Besides, Peggy depicted a history of incestuous abuse and a family that "disowned" her for divulging this fact; the trial court could fairly consider the benefit of distancing Ashley from these influences. The court could also conclude that at her age, Ashley needed a close relationship with her mother, as we recognized in Meredith v. Meredith, supra. The court specifically noted that Peggy would be more likely than Mark to foster continuing bonds with the noncustodial parent. Finally, a slavish adherence to "stability" would thwart almost every relocation out of state. Not every such move is bad. See Edwards v. Edwards, 556 So.2d 207 (La.App. 2d Cir. 1990); Weems v. Weems, supra. In sum, we do not find that the alleged breach of stability is enough to undermine the trial court's judgment as manifestly erroneous.
For the reasons expressed, the judgment is affirmed at appellant's cost.
AFFIRMED.