550 So.2d 913 (1989)
Kathleen Arms CLARK Plaintiff-Appellee,
v.
Nathaniel Jackson CLARK Defendant-Appellant.
No. 20854-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1989.
*914 Nelson, Hammons & White by Walter D. White, Shreveport, for defendant-appellant.
Love, Rigby, Dehan, McDaniel & Goode by Kenneth Rigby, Shreveport, for plaintiff-appellee.
Before MARVIN, FRED W. JONES, Jr., and LINDSAY, JJ.
MARVIN, Judge.
In this post-divorce action to modify child custody, we affirm a judgment rejecting the father's demands to reinstate his limited visitation privileges that were recognized in a 1986 judgment, which privileges, after a hearing on April 28, 1987, were suspended and prohibited by the trial court
until [the father] has undergone and completed professional psychological therapy and proves ... that visitation would not cause physical ... or psychological damage to the child, and reserving the right of the court to thereafter impose such ... conditions ... with respect to the visitation, as are necessary to minimize any risk of harm to the child, under the provisions of LSA-C.C. 147.
The quoted prohibition and suspension, which tracks the language of C.C. Art. 147, is contained in a judgment modifying custody that was signed April 28, 1987. The later 1987 divorce judgment continued in effect the above provisions "suspending the visitation privileges of [the father] with the said minor child ..." Neither of the 1987 judgments was appealed by the father.
Contrary to the father's assertions, we find these 1987 judgments are not ambiguous and are now "final" custody judgments. The trial court's judgment rejecting the father's demands is affirmed because he did not allege or show the required change of circumstances, that he has fulfilled the condition of the 1987 judgments by having "undergone and completed professional psychological therapy" and that his visits will not cause harm to his child. C.C. Arts. 146, 147.

THE FATHER'S CONTENTIONS
The father contends that he mistakenly "consented" to the suspension of his visitation privileges in the 1987 judgments and did not understand that his agreement to undergo "therapy" would require him to first "admit guilt" to a therapist that he had abused his child. He argues that this "ambiguity" in the 1987 judgments was not discovered until the delay for appealing those judgments had expired and that, short of "admitting guilt," which he says is an "impossible condition," he has done all he can reasonably do to undergo therapy and meet the conditions imposed by the trial court in 1987.
The father also contends that the trial court should have considered the record and transcript of the April 28, 1987, hearing which included depositions of several mental health professionals (before us as a proffer) and ruled that the 1987 judgments were "consent" and highly "ambiguous" judgments and, therefore, of no further force and effect.
At the hearing of the father's rule, the trial court sustained the mother's objection to the introduction of any evidence to modify custody until the father alleged and showed that he had "undergone and completed therapy."

FACTS
The mother sought the separation and sole custody in 1986, alleging the father's "sexual ... perversions." The father sought joint custody. The mother then alleged her belief that the father had sexually abused the child. The father did not contest the award, in November 1986, of sole custody to the mother with supervised visitation by the father with the child for about two months or the court's order that psychological examinations of the family and a DHHR "home study" be conducted.
Shortly after the two-month period of supervised visitation elapsed, the mother sought to terminate the visitation by a supplemental *915 petition filed February 3, 1987, in which she made detailed allegations of specific sexual abuse of the child by the father.
The mother's supplemental allegations were heard on April 28, 1987. At the hearing, the trial court heard the testimony of the mother and of Dr. Susan Vigen, a psychologist who works exclusively with children. Dr. Vigen had twice examined the three-year-old child. She stated that the child was very adept at identifying body parts on pictures, that the child made specific statements in the interviews regarding her activities with her father, and that these statements appeared to be uncoached and based upon the child's own experience. Based upon her visits, Dr. Vigen opined that there was a probability that the father had abused the child.
Additionally, the mother introduced into evidence the deposition of Robert Bishop and Eleanor Herd, both of whom had served as supervisors during the father's two-month period of restricted visitation. Mr. Bishop's deposition reveals that he was present when the child, while playing on the floor as he spoke with the mother, made statements about the father's alleged abusive activities. The mother also introduced a letter report of Dr. Nell Ryan, who recommended that the child get counseling even though she found no physical evidence of abuse.
The only evidence introduced by the father was the deposition of Dr. Donald K. Gucker. The deposition reveals that Dr. Gucker had seen all of the parties. He stated that during his session with the child, she was uncooperative and her statements were unreliable due to the inconsistency of her responses. He suggested that the child be interviewed by a female psychologist or social worker to see if it would be more productive.
Dr. Gucker also interviewed and consulted with the father, who was administered various psychological tests. In discussing the test results, Dr. Gucker stated that the father would have difficulty controlling impulses and may have a "tendency to justify himself acting on impulses to a mild or moderate degree," a finding which is "not usual," but "beyond normal limits." Dr. Gucker stated, however, that he could not link the results to any sexual impulses, but only possible risks.
The weight of this evidence, according to the trial court, was that the father may have sexually abused his daughter. The trial court impliedly found there was some degree of risk that the father is an incest offender and imposed the suspension and prohibition of which the father complains on appeal.
The evidence proffered by the father in this record consists of the April 28, 1987, transcript and later depositions of experts. The depositions reveal that there is some degree of risk (ranging from moderate to high) that the father is an incest offender. The father admitted to the professionals that he had been sexually abused for a "few years" beginning when he was about 10 years old (an "indication" to them because their studies show that 40 percent of child abusers were once victims of child abuse). He did not "admit," however, to sexually abusing his child and supported his denial with a polygraph test.
The mother and the child have undergone therapy and have been counseled repeatedly by professionals at the Genesis (treatment) Center during 1987 and 1988. In the 14 months after the November 1986 initial custody decree, the mother and the child were counselled about 70 times.
One expert explained that therapy in child abuse cases involves several steps, acknowledging the problem (the need to undergo treatment or therapy), examining the origins of the problem, and recognizing and understanding the impact of such behavior on the individual victim. This expert said, "there is no treatment without acknowledging the problem." This expert analogized the sexual offender to an alcoholic, each with a compulsive disorder. "There is a compulsion to act. The alcoholic is never cured. The sexual offender is never cured, but [with proper treatment] they ... can go through life without drinking or offending ..."
*916 Another expert "encouraged" the father to "become involved with the Genesis Center for two reasons ...," one of which was to become involved with the child's problem or therapy.
The father's complaint that he was required to "admit guilt," in order to undergo the required therapy, is based on questioning by the father's attorney of another professional whom the father had seen and who said:
As I understood it, [the father] had been ordered to seek treatment ... and my assumption ... was ... that that was his reason for contacting me. ... he indicated to me that his purpose was to get some information or talk about his daughter.
* * * * * *
The significant thing I recall is asking [him] to sign a consent for treatment. He refused to do that, saying he had no reasonhe wasn't there for treatment, wasn't going to get any treatment and wasn't going to sign, ... but wanted to talk to me about something else ... That's part of our policy. When we see people for any reason to help them with their situation, that is, treatment. And without the consent, we can't provide treatment. So it is real hard for me to talk to someone under those circumstances. It was a fairly short meeting and not a real productive one.
Q. ... [L]et me understand what I think you have told me. Even though [my client] contended he did nothing wrong to deserve treatment, he had to consent to treatment, in essence, admit he was a perpetrator before he could get any information, correct?
That's correct. And, at that point, the question of information ... would have been something I would have involved the attorneys in. When we are dealing with a non-custodial parent ... questions of release of information can be difficult. That was not my understanding at the time the appointment was made ... In answer to your other question, you know, the mothers who come into the Center have clearly done nothing wrong and they are required to sign the consent for treatment. Also, it has been my experience with men coming in treatment..., who are there now, five of them swore fervently on entering the program that they had done nothing wrong. At this point only one ... maintains that posture.
Notwithstanding this artful questioning by the father's attorney, we cannot agree with the father's argument that he has done "all he can reasonably do, short of admitting guilt," to fulfill the condition of the 1987 judgments which modified the initial custody decree.
In this respect, the father argues that in 1987 he was consenting only to an "evaluation" to determine whether or not he had abused his child and to "whatever counselling" was necessary to "prove" that he did not. Although technical distinctions perhaps can be made between "therapy," "evaluation," "counseling" and similar terminology in the record, the effect of the suspensive condition in the 1987 judgments is clear: The father's visitation rights cannot be exercised until he meets the required condition of undergoing and completing a period of contact (by whatever name: testing and counseling, evaluation, therapy, or treatment) with professionals who will, upon completion of the period, offer the trial court opinions whether the father's visitation will cause physical, emotional, or psychological damage to the child.
The words of the 1987 judgments complained of should not be read in a strained, but in an ordinary, sense. RS 1:3. According to this record, other fathers have consented, in writing, to such treatment without categorically admitting guilt. The mother has consented to such treatment. Under these circumstances, the father should not be allowed to refuse to consent to what the judgments require of him, that is, simply to undergo and complete a period of professional treatment or therapy.
In essence, the father is contending that his refusal to consent to "treatment" (professional psychological therapy) should be found "reasonable" and should serve to *917 make the 1987 judgments unenforceable. Unlike the father's counsel, and having considered all of the record, including the proffer, we cannot construe the father's consent to "treatment" as an admission of guilt. The 1987 judgments do not require him to admit guilt. Neither should he or we. His refusal to consent to "treatment" is found unreasonable and does not negate the force and effect of the 1987 judgments.

THE LAW
Courts have found psychological examinations of the family to be beneficial. The results of such examinations enable a court to determine the child's best interest and to tailor a custody order that minimizes the risk of harm to the child. A court has much authority to order such examinations. C.C. Arts. 146, 147. See C.F.C. v. J.D.C., 539 So.2d 47 (La.App. 4th Cir.1988) and authority cited therein.
A trial court has continuing jurisdiction to modify child custody and impose protective conditions in a judgment. C.C. Arts. 146(E), (F); 147. Bergeron v. Bergeron, 492 So.2d 1193, 1195 (La.1986).
Here, and in accord with the original custody order in November 1986, psychological examinations of the child were conducted. These examinations produced evidence that the child probably had been abused by her father. The father was aware of that evidence when he "consented" to the suspensive condition of which he complains. He was represented by counsel and is deemed to have been aware that, after he had completed "therapy," and in order to resume visiting his child, he would first have to prove to the court that his visits would pose no risk of harm to her under C.C. Art. 147 standards.
Where child abuse has been found by a preponderance of the evidence
the court shall prohibit visitation ... until [the abusive parent] proves that visitation would not cause physical, emotional, or psychological damage to the child ... [or] order such restrictions, conditions, and safeguards necessary to minimize any risk of harm to the child.
 C.C. Art. 147.
The 1987 judgments complained of similarly prohibits and suspends visitation
until [the father] has undergone and completed professional psychological therapy and proves ... that visitation would not cause ... damage to the child, and reserving the right of the court to thereafter impose such ... conditions ... as are necessary to minimize any risk of harm to the child, under the provisions of LSA-C.C. 147.
The father does not question that the trial court was authorized by C.C. Arts. 146 and 147 to prohibit or restrict his visitation privileges in 1986 or 1987.
The initial custody decree did not unconditionally grant visitation privileges to the father, but limited the father's privileges and contemplated a review by the court after psychological examinations were made of the family. The 1986 custody judgment effectively "cautioned" the father that professionals would examine the family about the allegations of the father's "sexual perversions." The results of these examinations were introduced at the April 28, 1987, hearing. The 1987 judgments, which prohibited the father's visitation until he underwent and completed therapy, are final and binding on the litigants and the courts.
To further modify custody, the father must allege and show the change in circumstances that the law and the 1987 judgments require, specifically, that, in the opinion of experts who have "treated" him, his visitation with the child will not cause her physical, emotional, or psychological harm. C.C. Art. 147.

DECREE
At the father's cost, the judgment rejecting his demands is AFFIRMED.