604 So.2d 107 (1992)
Karen Medlin NORRIS, Plaintiff/Appellee,
v.
James E. NORRIS, Defendant/Appellant.
No. 23718-CA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1992.
*108 James E. Franklin, Jr., Shreveport, for defendant/appellant.
W. Eugene Golden, Shreveport, for plaintiff/appellee.
Before MARVIN, NORRIS and STEWART, JJ.
NORRIS, Judge.
After obtaining judgments of separation and divorce in which joint custody was essentially uncontested, Karen Norris filed the instant petition in rule against her former husband, James Norris, seeking sole custody of the couple's three children and an increase of child support. The trial court conducted a hearing and awarded sole custody to Karen, subject to "reasonable restricted/supervised visitation" on the part of James. The court also raised James's monthly child support from $400 to $746.85. James appeals devolutively. For the reasons expressed, we affirm the judgment insofar as it changes custody and restricts visitation. We amend and affirm the child support award to reflect the highest reasonable value of free housing that James receives from his landlords.

Procedural background
Karen and James married in 1976. Their daughter, Stefanie, was born in 1979; the twin boys, Joseph and Stephen, were born in 1981. Stephen is autistic and must take a tranquilizer, Haldol, which costs over $300 a month.
Karen filed for separation in 1989, alleging cruel treatment, mainly that James was having an extramarital affair. She also alleged, in ¶ 5C, that
Defendant has an attraction to teenaged girls and has on numerous occasions made sexual advances toward them.
*109 She prayed for the "temporary and, in due time, permanent custody" of the children, without specifying whether she meant sole custody or joint custody with herself as domiciliary parent. James's answer urged general denials.
A hearing was held on December 13, 1989. The record does not contain a transcript of this hearing, but the court minutes state that the matter was
Regularly taken up on rule and merits. Evidence adduced, closed and matter submitted. Judgment rendered in favor of plaintiff awarding her a separation. Further judgment rendered, by agreement, awarding joint custody with plaintiff being the domiciliary parent[.]
The resultant judgment, dated January 10, 1990, recites that the matter came up regularly for trial with both attorneys present. "The court having heard the evidence and stipulations of counsel, and by agreement between the parties" it was ordered that Karen be awarded a separation and that "the parties be granted the Joint Legal Custody of the minor children" with Karen as domiciliary custodian and James to exercise reasonable visitation. Child support was fixed at $100 per month, as James was unemployed at the time.
In July 1990 Karen filed for final divorce, based on former La.R.S. 9:302. She prayed that "said Joint Custody be continued." She also alleged that the parties "have agreed upon child support in the amount of $400.00 per month" as James was working by then. James signed an affidavit accepting service, La.C.C.P. art. 1201 B, and let the matter go by default. The judgment, dated August 16, awarded joint custody "subject to the previously filed Joint Custody Plan."
On March 25, 1991 Karen filed the instant petition in rule for sole custody and to increase child support. The increase was based on an allegation that her income had declined because she had to arrange her work schedule to meet the autistic child's school bus. She also alleged that James's income increased since the divorce. The custody change was based on Karen's "fears for the emotional and well being of the minor children, to the extent that the atmosphere of defendant's home is morally and spiritually detrimental to the upbringing of the children." Specifically she alleged that James was living with a woman, "Barbara N.," in an apartment on Cross Lake. The hearing was scheduled for May 13, 1991.

Summary of evidence
At the top of the hearing, James testified on cross examination that he was not living with Barbara N. in an apartment, but rather was renting a small one-room cottage on the lake and living by himself. The trial court ultimately found that James was not living with any woman.
Karen's attorney then asked James about some incidents about 10 years earlier at Berean Baptist Temple, which James and Karen attended (since the separation, James has joined another church). James objected, urging an exception of res judicata in that the allegation of sexual advances toward teenage girls had been pleaded and resolved at the time of separation and could not now be relitigated. The trial court took the exception under advisement and heard evidence.[1]
The first type of misconduct allegedly occurred 10 or 12 years ago at Berean Baptist, when James was involved in the youth music ministry and was an assistant Vacation Bible School bus driver. Another church volunteer, Dale Watkins, testified that he saw James holding two girls' hands on the VBS bus; James also offered to drive two girls home in his own car, not the VBS bus. And once in a church hallway, Watkins saw James walk up behind a girl, give her a bear hug and touch her breasts in the process. Watkins admitted he never talked about these matters "in detail" with the pastor, and admitted that the church never received any complaints from either the girls or their parents about James's conduct. James admitted that he held children's *110 hands on the bus, but only to encourage them to sing. He also admitted that he hugged children in church, but did not touch their breasts; he said it was "common knowledge" that a church gossip was spreading the rumor that he did. R.p. 241.
The second type of misconduct, only recently discovered, occurred seven to 12 years ago and involved Karen's younger sister, Kelly Goodman, who was 19 years old at the time of trial and recently married. She admitted she never spoke about these incidents until she told her financé (now her husband) in early 1991; and she did not tell Karen's lawyer about it until May 10, 1991, the Friday before trial began.[2]
Kelly testified that when she was about seven, James began touching her private parts. Shortly after this, he began making her perform oral sex on him; this occurred more than 10 times and went on intermittently for about five years. Typically James would ask her to help him do something in the barn, and once it happened on the side of the road after they had run an errand. James would hold her head down to make her comply, and she did not have the strength to escape. He did not threaten to hurt her, but told her that if she reported it, no one would believe her and she would probably be "taken away." The final incident was when she was 12 years old, when her brother Robbie was going away to college. Kelly was close to him and depressed at his imminent departure; he had never been away from home for more than a few days. Kelly's mother and sisters, with James and the three children, were together in the living room; Kelly was in the adjacent den, when James came in to "comfort" her. However, he slid her pants down and made her bend over the bed; accustomed to his abuse, she complied. He then inserted his member in her rectum. She testified she was "too embarrassed" to cry for help. She waited until 1991 to report this, and told it to Karen's lawyer at this late date only because she realized that Karen's daughter, Stefanie, is now 12 years old.
In an attempt to refute Kelly's testimony, James called Dr. John P. Harris, an internist. Dr. Harris had never examined Kelly but testified that inserting anything, even a flexible sigmoidoscope, into a person's rectum is very painful. He felt it would be "extremely difficult" for an adult man to insert his erect penis, without lubrication, into a 12 year old girl's rectum; the girl would probably cry out, moan or scream. Kelly admitted she did not scream or alert anyone when James sodomized her. James's attorney also made a stipulation as to the testimony of Karen and Kelly's mother, Melba Constable. Mrs. Constable would testify that her son Robbie was 29 years old at the time of trial and left for Northwestern at age 17 (thus when he went to college Kelly was only seven years old). Mrs. Constable would also testify that after four years at NSU and two years of working in Shreveport, Robbie left home again for a job in Houston. On direct examination, Mrs. Constable said she had no first hand knowledge that James ever abused Kelly, but she had seen him hugging her in the kitchen.
James denied everything. He admitted, however, that on several occasions Kelly accompanied him to the barn. At one point he said he never asked her to come along, and it was actually Kelly's stepfather who told her to do so to help him find something or give one of the animals a shot. R.pp. 185, 253. Nevertheless James wanted her to accompany him to the barn. R.p. 249. On the day that Robbie left for college, James recalled, the family had a goingaway party and Kelly was upset to the point of crying; she left the room and went off by herself. R.p. 272.
James also testified, and Karen admitted, that he had been exercising weekend visitation for over a year and Stefanie had never complained of abuse or mistreatment. Karen felt that James fondles Stefanie too *111 much, based on one incident when he washed the girl's feet and lathered her up to the thigh. R.p. 309.
On the issue of child support, Karen testified that at the time of divorce she was working at Magnolia Manor Nursing Home, making $8.50 per hour; however, she had to rearrange her work to be able to meet Stephen at his school bus, so she now works at Heritage Manor Nursing Home, making only $8.20 per hour. Stephen must take a tranquilizer, Haldol. Prior to the divorce, she was receiving an SSI check of $336.94 per month to cover this expense. However, when support was raised from $100 to $400 per month, SSI decreased its payment to $47.76, a decrease of $289.18 per month.
James testified that prior to the separation, he was working at the LSU Med Center physical plant, making $10.25 per hour. He left LSU and was unemployed at the time of the separation, but started back at LSU sometime in 1990 at a wage of $10.63 per hour, which he was earning when the judgment of divorce was rendered and support was set at $400 per month. He is not eligible for any further step increases. After the divorce James moved from the apartment and now rents a cottage on Cross Lake from Mr. and Mrs. White, an elderly couple. He testified that he does personal work, perhaps 25 or 30 hours per week, for the Whites in lieu of paying rent and utilities; his only living expense is his phone. He testified they made this arrangement because he could not afford what the previous tenants had paid; however, he could not guess how much they paid, or what his package was worth. When pressed on cross examination, he made a "shot in the dark" with "no prior experience to base" it on, and estimated that his rent and utilities were worth $800 per month.

Action of the trial court
By written reasons of May 21, 1991, the court reviewed the procedural stance of the case and found that the original judgment of joint custody (January 10, 1990) was not a considered decree for purposes of modifying custody under Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). Thus Karen Norris could obtain a change of custody merely on proof of the best interest of the children.
On the merits, the court rejected Karen's claim that James was living with "Barbara N." On the claim that James had made sexual advances toward teenage girls, the court noted James's exception of res judicata but pretermitted any discussion of the exception. The court found that Karen was aware of Dale Watkins's allegations prior to the separation but his testimony was "inadequate" to modify custody. R.p. 36.
On the claim of James's misconduct with Kelly Goodman, the court stressed its great difficulty in resolving the conflicts in this "extremely disturbing" testimony. The court ultimately found Kelly's account of the misconduct more credible than James's denials. Kelly withstood the "burning ring of fire" to recount the indignities visited upon her by James, while James was "cold and his calmness unnerving." R.p. 38. The court therefore granted Karen sole custody of the children.
The court then cited La.C.C. art. 132, which grants to the noncustodial parent reasonable visitation of the child "unless the court finds, after a hearing, that visitation would not be in the best interest of the child." Because of James's "abnormal sexual history," the court awarded him "reasonable restricted/supervised visitation":
until such time that defendant can establish and/or demonstrate to this Court that he has been fully rehabilitated through appropriate expert testimony. Defendant shall provide proof of his rehabilitation through professional counseling and/or therapy and provide such proof to this court.
Turning to child support, the court cited La.R.S. 9:311, which states that an award for support shall not be reduced or increased "unless the party seeking the reduction or increase shows a change in circumstances" of one of the parties. The court held that this statute altered jurisprudence requiring proof of a substantial *112 change of circumstances. Since the date of the divorce, Karen lost SSI benefits of nearly $300 per month and wages of $.20 per hour. James did not have any pay raise but had imputed income from the work for his landlords, which he himself valued at $800 per month. Applying this to James's income according to the formula of La.R.S. 9:315 et seq., the court figured James's monthly support obligation to be $746.85. The court did not require James to carry the children's health insurance or split their medical bills.
James has appealed devolutively, advancing 10 assignments of error.

Discussion: Burden of proof
By his fourth assignment James urges the trial court erred in finding the prior joint custody judgment was not a considered decree and in declining to apply the "heavy burden" rule approved in Bergeron v. Bergeron, supra. The fifth assignment urges the court erred in applying the wrong burden of proof and not requiring Karen to show both a change of circumstances and that the change of custody would be in the children's best interest.
Was the January 1990 judgment a "considered" decree? A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court. Myers v. Myers, 561 So.2d 875 (La.App. 2d Cir.1990), and citations therein. By contrast, a judgment with a custody plan that was entered by default, was not contested or was entered merely by the consent of the parties is not a considered decree. Key v. Key, 519 So.2d 319 (La. App. 2d Cir.1988).
The January 1990 judgment is somewhat ambiguous, referring both to "evidence and stipulations" and "agreement between the parties." Apparently some aspect of the relief granted was contested while another was not. There is no transcript to prove which was which. The court minutes, however, clarify by stating that evidence was adduced with respect to the separation, while "further judgment [was] rendered, by agreement, awarding joint custody[.]" The "evidence adduced" must have pertained to Karen's allegations of cruel treatment, while the agreement covered joint custody. The trial court's interpretation of the January 1990 judgment as not being a considered decree of joint custody is not plainly wrong. Virgil v. American Guar. & Liability Ins., 507 So.2d 825 (La.1987).
In Bergeron v. Bergeron, supra, the Supreme Court analyzed the manner of proof required for petitions to modify child custody. Prior to codal amendments of 1977 (which introduced "best interest" as the standard in C.C. art. 131 E's predecessor article) and 1982 (which created the presumption of joint custody),[3] there were five traditional jurisprudential rules that applied. Id., at 1196. The court restated the "heavy burden" rule only for cases in which there was a prior, considered decree. Id., at 1200. As for the other genderneutral rules (change of circumstances requirement and appellate review standard), however, the court found that these were retained for all petitions to modify custody. Id., at 1203.
This court has often stated that even in the absence of a considered decree, the party seeking a change of custody must show a change of circumstances and that the proposed change of custody would be in the best interest of the child. See, e.g., Myers v. Myers, supra at 878; Foy v. Foy, 505 So.2d 850 (La.App.2d Cir.1987); Pulley v. Pulley, 587 So.2d 116 (La.App.2d Cir. 1991). In other cases we have stated that the proper standard to apply is simply the best interest of the children. Hillidge v. McFarland, 566 So.2d 192 (La.App.2d Cir. 1990); Risher v. Risher, 511 So.2d 1220 (La.App.2d Cir.1987); La.C.C. art. 131 E. In the latter cases we have added that stability and continuity of environment remain, at all times, important considerations in making a custody determination. Hillidge v. McFarland, supra at 194; Risher v. Risher, supra at 1222. The codal standard of "best interest" encompasses all the *113 gender-neutral jurisprudential rules summarized in Bergeron.
The trial court's statement of the standard was not detailed but this is not grounds for reversal on the instant facts. When she agreed to the custody plan, Karen Norris was not aware of her husband's history. The newly discovered evidence of James's conduct with Kelly is, in effect, a sufficient change of circumstances. Considering the children's best interest, the trial court was not clearly wrong to find that they would be at risk without supervised visitation. Moreover, the change in custody does not destabilize their environment: under the joint custody plan, Karen Norris was the domiciliary parent with final say in setting the children's rules and regulations, while James's custody was by way of visitation apparently on alternating weekends. The new plan makes Karen the sole custodian and grants James reasonable (yet restricted) visitation on alternating weekends; there is no undue disruption of the children's environment. The fourth and fifth assignments do not present error.

Res judicata
By his third assignment James urges the trial court erred in not applying res judicata and in permitting evidence to be adduced on matters that had already been adjudged in the judgment of separation. He argues that Dale Watkins and Karen Norris's testimony, and his own cross examination, about events that occurred at Berean Baptist Church some 10 years earlier, should have been excluded.
James cites both the old res judicata law, contained in former La.C.C. art. 2286 until 1985 and in La. 13:4231 until the end of 1990, and the new, more preclusive law, R.S. 13:4231, which took effect in January 1991. It is clear, however, that the instant action, filed on September 29, 1989, is governed by the previous law. See La.Acts 1990, No. 521, § 1. That law provided:
§ 4231. Res judicata; essential elements
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.
After James's counsel orally raised the exception, the trial court was entitled to receive and evaluate evidence on the issue. La.C.C.P. art. 931; Orgeron v. Loop Inc., 433 So.2d 278 (La.App. 1st Cir.1983). The court found that the incidents related by Mr. Watkins all occurred before the trial of the separation. However, child custody was not actually litigated at that trial (the resultant judgment was not a "considered decree"), as it was at the instant trial; this defeats the identity of cause required to bar the later action. Cf. Sklar v. Sklar, 387 So.2d 1308 (La.App. 1st Cir.1980). Res judicata did not bar the consideration of this evidence.
Moreover, the trial court found Mr. Watkins's testimony "inadequate" to support the change of custody sought by Karen. James's testimony consisted of denials, and Karen had no first hand knowledge of the events. In sum, this evidence did not affect the outcome of the trial. The court did not err in declining to rule on the exception. This assignment lacks merit.

Manifest error
By his first and second assignments James urges the trial court erred in terminating joint custody and awarding sole custody to Karen; by his sixth assignment he urges the court erred in believing Kelly Goodman's testimony that he sexually molested her.
The trial court's determinations in child custody matters are entitled to great weight and its discretion will not be disturbed on review in the absence of a clear showing of abuse. Bergeron v. Bergeron, supra; Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971). In Rosell v. Esco, 549 So.2d 840 (La.1989), the Supreme Court reiterated the precepts of manifest error:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong *114 standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Canter [ v. Koehring, 283 So.2d 716 (La.1973); other cites omitted]. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. [Cites omitted.] But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. [Cites omitted.] 549 So.2d at 844-845.
The trial court aptly noted the dilemma of resolving James Norris's and Kelly Goodman's diametrically opposed versions of what happened. The court had the superior vantage point to observe each witness's demeanor and tone of voice. Each witness testified extensively on direct and was questioned pointedly on cross. The court found Kelly Goodman credible, and the record simply does not undermine this finding.
We recognize that Kelly's account does not withstand the strictest scrutiny, as shown by James's brief. She said the abuse began at age seven and culminated with the act of anal intercourse at age 12; however, she dated the final act by reference to another event (Robbie's departure for college) which surely occurred when she was only seven. Dr. Harris stated the opinion that if anal intercourse really happened, the victim probably would have screamed in pain; however, Kelly did not scream. Finally there was her long silence, which was not broken until the eve of her sister's custody hearing, in an atmosphere of bitter family animosity.
These inconsistencies are not so great that the trial court was bound to reject the testimony. For example, Mrs. Constable intimated that her son left town for a job in Houston some six years after he left town for NSU. It is possible that the latter departure, which would have been when Kelly was about 13, was the occasion for the family gathering and the abusive act (in other respects the record may support this conclusion) but Kelly was just mistaken about Robbie's destination. However, trial counsel for James Norris entered a stipulation, thus blocking further questioning of Mrs. Constable which may have clarified the matter. As for the medical evidence, Dr. Harris felt that actual penetration was improbable. However, Kelly's account must be viewed in light of her youth and inexperience at the time. The court resolved the conflict by finding "one episode of attempted anal intercourse," which we will not disturb. As for Kelly's long silence, this does not necessarily mean that her account was fabricated. The vileness of the experience and the humiliation of having to make it public will adequately explain this victim's reluctance to come forward any sooner.
The court discredited James's denials, citing his "unnerving calmness." We cannot contest this observation of demeanor. Even from the impassive record we can see that James was often evasive; one example will suffice. At the end of James's redirect, the court questioned him as follows:
THE COURT: So in other words, just so that I can have the issue properly crystallized, what Ms. Goodman told us when she testified over an hour and a half, or whatever it took, two hours, about the oral sex for a number of years, and anal sexual episode at age 12, and all that business, it's your testimony that none of that took place, and none of it was true?
MR. NORRIS: Not by myself, no, sir.
THE COURT: What does that mean?
MR. NORRIS: I mean I didn't do it.
THE COURT: Did you mean something in particular when you said, "Not by myself"?

*115 MR. NORRIS: Well, I'm saying that, basically, it might have occurred; but if it did, I didn't do it.
THE COURT: Do you know, or have knowledge, that it occurred with someone else?
MR. NORRIS: No, sir.
THE COURT: You're just saying that if it occurred, it wasn't with you?
MR. NORRIS: Yes, sir. I'm sorry.
R.pp. 262-263.
This sounds like James, in an unguarded moment, admitted the allegations but felt the acts were done with Kelly's consent. Then he retracted and explained, but not very impressively. With statements like these on the record, we will not disturb the trial court's explicit choice to accept Kelly Goodman's version and reject James Norris's. The finding is not plainly wrong, and it supports the termination of joint custody.
These assignments lack merit.

Restricted visitation
By his tenth assignment James urges the trial court erred in ordering his visits with the children to be restricted/supervised until such time as he demonstrate or establish, through appropriate expert testimony, that he has been rehabilitated. He argues at the outset that the finding of sexual abuse was wrong; for reasons already discussed, this contention fails. He further complains that the court overlooked the provisions of La.C.C. art. 133, which will not support restrictions on his visits; and that the requirement of professional therapy is unduly burdensome, as it will force him to admit conduct which he denies.
James is correct to argue that the statute authorizing restricted visitation is not cited or considered in the trial court's opinion. La.C.C. art. 133 provides in pertinent part:
Art. 133. Restriction of visitation
A. Whenever the court finds by a preponderance of the evidence that a parent has subjected his or her child to cruel physical abuse, or sexual abuse or exploitation, the court shall prohibit visitation between the abusive parent and the abused child until such parent proves that visitation would not cause physical, emotional, or psychological damage to the child. Should visitation be allowed, the court shall order such restrictions, conditions, and safeguards necessary to minimize any risk of harm to the child. All costs incurred in compliance with the provisions of this Article shall be borne by the abusive parent. * * *
A plain reading of this article, James urges, shows that to restrict visitation, the court must find that the parent abused his own child. James did not abuse any of his children; ergo, restricted visitation is not proper. We acknowledge the facility of this reasoning, but refer to the general principle of visitation:
Art. 132. Award of visitation rights
A parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child. * * *
Courts have inherent power to determine a child's best interest and to tailor a custody order, including visitation, that minimizes the risk of harm to the child. Clark v. Clark, 550 So.2d 913 (La.App.2d Cir.1989); C.F.C. v. J.D.C., 539 So.2d 47 (La.App. 4th Cir.1988). To read art. 133 literally would lead to the absurd conclusion that visitation cannot be restricted for a parent who abused a neighbor's child but has not abused his own child yet. La.C.C. art. 9. In fact, prior to the enactment of arts. 132 and 133 (La.Acts 1988, No. 817 and Acts 1986, No. 966), the jurisprudence permitted courts to restrict visitation even though the offending parent's conduct was not directed specifically at his own children. See, e.g., Shipp v. Shipp, 183 La. 1025, 165 So. 189 (1935); Slaughter v. Slaughter, 499 So.2d 1123 (La.App.3d Cir. 1986). On the basis of the general precepts of art. 132 and the jurisprudence, and in spite of the literal wording of art. 133, the trial court was not plainly wrong to order restricted visitation.
Finally James argues that the order is tantamount to making him admit he is a child abuser, which he categorically denies. *116 In Clark v. Clark, supra, this court reviewed expert evidence and concluded that "other fathers have consented, in writing, to such treatment without categorically admitting guilt." Id., at 916. The article contemplates ordering psychological help; the alternative is to restrict James Norris's visitation without any prospect of lifting the restrictions and resuming normal visitation. Under the circumstances, the instant order is not unduly burdensome.
This assignment lacks merit.

Child support
By his seventh and ninth assignments James urges the trial court applied the wrong standard of proof for an increase of child support; by his eighth, he urges the court erred in increasing his child support.
In its opinion the trial court acknowledged the jurisprudential rule that a party seeking to modify an award of child support must show a substantial change of circumstances. Mitchell v. Mitchell, 543 So.2d 128 (La.App.2d Cir.1989), and citations therein. However, in 1985 the legislature enacted La.R.S. 9:311, which specifies only "a change in circumstances of one of the parties" as the basis for modifying the award. The court felt that the "conspicuous" deletion of the word "substantial" signaled an intent to lessen the standard; thus any change of circumstances would support an increase or decrease in support. However, in Crowder v. Crowder, 595 So.2d 810 (La.App.2d Cir.1992), this court rejected the "any change" analysis, noting that such an approach would promote instability in child support matters by inviting frequent relitigation. "We do not identify that result as a likely goal of our legislature." Id., at 811. See also Osborne v. Osborne, 512 So.2d 645 (La.App.2d Cir. 1987).
The trial court was therefore wrong to adhere to the "any change" analysis. If the only change in the parties' positions was Karen Norris's $0.30 per hour loss of pay, there would probably not be grounds to modify the support award. We would also note that the August 1990 increase of child support of $300 apparently resulted in a loss of $289 in SSI benefits.
The important item, however, is James's new rent arrangement with the Whites. He now lives in a cottage apartment for which he pays no cash for rent or utilities, freeing up several hundred dollars a month in his budget. James urges that the trial court should not have included this item in the calculation. La.R.S. 9:315(4)(b) defines gross income to include:
Expense reimbursement or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business, if the reimbursements or payments are significant and reduce the parent's personal living expenses. Such payments include but are not limited to a company car, free housing, or reimbursed meals[.]
The value of James's housing and utilities is significant and reduces his personal living expenses, so it should be counted as gross income. We are constrained to find, nevertheless, that the court's valuation of this item is excessive.
The court used the sum of $800 per month, which James himself offered and, as Karen Norris argues in brief, was undisputed. Even so, this value is highly suspect. James is, by his own admission, dyslexic and not good with numbers. R.p. 109. On the first day of trial, he estimated his hourly wage somewhat higher than his paystubs ultimately proved. Several times he was asked what it would cost to live in this cottage, and he declined to guess. When pressed hard, admitting "no prior experience to base from where I've lived before," he offered $800 as a "shot in the dark." R.pp. 222-223. James Norris lives in a one-room cottage, part of which is a storage room for his landlords. His living space measures about 15 × 20'. R.p. 254. In fact, the court cited the minimal privacy afforded by this cottage as a consideration in restricting visitation, so as to avoid too much closeness between father and daughter. R.p. 39. Even though $800 was James's own reluctant estimate, it lacked a firm basis and is unreasonably high. The highest value we could affirm under the *117 circumstances is $500, the amount first proposed by Karen Norris's attorney at trial. R.p. 222.
With this figure, James's monthly gross income is $2,342.58, constituting 62.4% of the combined total. James's share of the basic support obligation of $1,078 is therefore $672.67. The judgment will be amended accordingly.

Conclusion
For the reasons expressed, the judgment is affirmed insofar as it modifies the custody award and restricts James Norris's visitation rights. The child support award, however, is amended to $672.67 per month and, as amended, affirmed. Costs are assessed equally to the parties.
CUSTODY AND VISITATION AFFIRMED. CHILD SUPPORT AMENDED AND AFFIRMED.
NOTES
[1] The exact sequence of testimony was hard to discern as the transcript forwarded to this court was poorly prepared and not in chronological order.
[2] The court offered to grant a recess so Karen Norris could amend her rule and, presumably, so James could prepare to defend against the new evidence. Counsel for James declined, saying he was "ready to litigate." R.p. 123.
[3] La.Acts 1977, No. 448; La.Acts 1982, No. 307.