STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 04-1053 consolidated with CA 04-1054

PATRICK JEFFERSON MURPHY

VERSUS

SUSAN LYNN MURPHY, BORN BOOK

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2002-1792
HONORABLEGUY ERNEST BRADBERRY, DISTRICT JUDGE

**********

BILLIE COLOMBARO WOODARD
JUDGE

**********

Court composed of Billie Colombaro Woodard, Elizabeth A. Pickett, and John B. Scofield,[*] Judges.

REVERSED AND RENDERED.

Walter Marshall Sanchez
Lorenzi, Sanchez & Palay
518 Pujo Street
Lake Charles, Louisiana 70601
(337) 436-8401
COUNSEL FOR
PLAINTIFF/APPELLEE:
    Patrick Jefferson Murphy

Michael Steven Beverung
Book & Beverung
620 Esplanade, #103
Lake Charles, Louisiana 70607
(337) 478-8706
COUNSEL FOR
DEFENDANT/APPELLANT:
    Susie Lynn Book

---

[*]Judge John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge *Pro Tempore*.

WOODARD, Judge.

Susan Murphy, born Book, appealed the trial court's judgment, allowing Patrick Murphy's father, Jeff Murphy, unsupervised visits with their female child, as well as the court's order that she pay $920.00 to Black Lake Marsh, Inc.,as reimbursement for copying costs it paid to Scott Sebastien, a CPA.

Because of the uncontradicted testimony, concerning Jeff Murphy's sexual misconduct with a minor and Patrick having no right of action in seeking a judgment in a third party's favor, we reverse.

\* \* \* \* \*

Susan and Patrick were married on July 12, 1997 in Lake Charles. Their marriage produced one child, J.M., born on July 13, 2000. The parties separated on March 29, 2002. On April 8, 2002, Patrick filed for divorce, and on April 9, 2002, Susan also filed for divorce. The trial court consolidated these actions, and on April 11, 2003, granted a divorce, pending certain issues. Two of those issues are presented in this case.

The first is whether the trial court erred by not requiring supervised visits with the grandfather, Jeff Murphy, after another family member made allegations of sexual molestation against him. The second issue is whether the trial court erred by rendering a judgment for copying costs of $920.00 in favor of Jeff Murphy's business, Black Lake Marsh, Inc., a non-party to the litigation.

**STANDARD OF REVIEW**

On February 18, 2003, the trial judge concluded that the child will not "be placed in harms way nor exposed to *irreparable injury* if she is allowed to exercise unsupervised visitation with the paternal grandfather." (Emphasis added.)

Patrick's counsel conceded at oral argument and indicated in his brief that "irreparable injury" is the incorrect legal standard for custody/visitation determinations; thus, a *de novo* review is appropriate. We agree.

When the lower court commits legal error by applying an incorrect legal standard, we "determine the facts *de novo* from the record" and "render a decision on

the merits."[1] Accordingly, we will conduct a *de novo* review of the instant case, using the best interest of the child inquiry.[2]

**SUPERVISED VISITATION UNDER *DE NOVO* REVIEW**

On January 14, 2003, the trial court ordered the parties to undergo evaluations to help determine a custody schedule for J.M. The evaluator, Susan, and Patrick reached a tentative agreement on a custody schedule. However, Susan required a stipulation that the child not be left unsupervised with the paternal grandfather, Jeff, because of allegations of sexual abuse Amy McIntosh, Patrick's cousin, had made against him. Patrick refused this request.

The trial court heard the issue on November 18, 2003. At this hearing, Susan introduced, without objection, Amy's deposition. Amy testified that Jeff had sexually molested her several times over the course of several years when she was a minor. Notwithstanding, the court denied Susan's request for supervised visitation.

*TESTIMONY REGARDING MOLESTATION*

Patrick's counsel insinuated at oral argument that Amy's allegations surfaced for the first time during this litigation and, solely, to support Susan's position; therefore, they are false.

On the contrary, the record reveals that Amy chronicled an abundance of disclosures she made before this litigation was ever conceived. Namely, she testified that she had told Patrick's sister, Rachel, about the molestation more than once, the first time being the day after it occurred. Amy said Rachel answered, "I warned you," and indicated that Jeff had inappropriately touched her after she had developed but that "it's no big deal now." Also, Amy testified that she had attended therapy sessions with three therapists because of this molestation and had spoken to other family members about it, well before this litigation began.

After Rachel, Melissa Murphy, Jeff's niece, was the first family member she spoke to about the molestation. She gave a very specific account of their discussion, as well as the place and circumstances surrounding their talk, which had occurred

---

[1]*Wallmuth v. Rapides Parish School Bd.*, 01-1779, p.7 n.2 (La.4/3/02), 813 So.2d 341, 345 n.2.

[2]La.Civ.Code art. 131.

around 1992. Melissa had picked Amy up from a seminar she had attended, and they talked in Melissa's car on the way home from Baton Rouge. When Patrick's counsel asked her, "How did you describe it to Melissa...," she responded:

> I don't even think I told her who. She just guessed right. I told her *I was sexually molested as a young teen and that was some of the issues I had been working on in the seminars* and she asked who, and I just shut up and looked out the window away from her; and she kept talking and she said, "I know it wasn't your daddy, and I know it wasn't my daddy [Fred], so there's only one left," and that's when I looked at her and I said "Yeah."

(Emphasis added.)

Amy reported that soon after this discussion, Melissa accompanied her to speak with Rachel about it, again, around 1992 at Rachel's new home. Amy stated that Rachel confirmed that she had previously warned her about Jeff but added, "But, you know, it was no big deal."

The next family member she told was Melissa's father, Jeff's brother, Fred. Again, she gave a meticulous account of when and where the disclosure took place, as well as the circumstances surrounding it. Around 1992 or 1993, she had gone into Fred's convenience store on Legion street for a snack. They had started talking, and "It came out." She remembers telling him that "Jeff sexually assaulted me" and that he asked, "What do you mean...are you sure?" She said she told him, "Yes." "He touched me in places on my body that he had no right to." He asked her how old she was and "if anyone else knew." She told him the age and that she had told Melissa. Amy described his reaction. "He was quite shocked and upset....He was silent for a long time." She said that, approximately a month later, "He pulled me in his office when I stopped in the store again and started asking me other questions...." "He just wanted to know if I told my mom and dad or anybody else, and I told him no. He told me I needed to."

Soon afterwards, Amy relates that she confronted Jeff and told him that he "sexually molested ... [her] and I know you did and the family knows." After confronting him, she went to her mother's house and "told her what had happened. And it seemed within minutes Aunt Beni [Fred's wife] and Kathleen were there asking me to tell them what happened." She stated that she had even tried to tell "Pat" [Patrick Murphy] about the situation around 1993. They were both walking across

McNeese's campus, and she had tried to speak with him, but he ignored her. She surmised that he would not speak to her because, by then, it was common knowledge within the family that she had been making allegations of sexual molestation. The next time she tried to speak with him about the subject was at Fred's children's [John and Mary Murphy] house. She was already there when "Pat" came in. She said they hugged "right off. We didn't even talk. We just started hugging and he whispered in my ear that he believed me and that it was going to be okay."

She also had discussed the subject with Susan when Susan and Patrick were newly married. She had seen Susan in the grocery store. Susan was complaining about the way Jeff was treating Patrick and "how Pat just takes it and...doesn't stand up to him...." At that encounter, Amy just told her to "be careful around Jeff" and that he was a "very powerful man." It was the second time they spoke about it that Amy explained what she had meant in the grocery store. Amy details those circumstances. They were at Kathleen's house, in the kitchen, and Susan brought it up. It was before Jordan's birth. Amy states that Susan said that she had heard the allegation and asked if it was true. Susan wanted to know when it happened, what had happened, and how old she was. After that, the next discussion occurred between Susan, Amy, and Amy's mother while they were in the store.

While Rachel denied Amy's assertions of what she had allegedly told Amy, she did confirm, as did Susan, that Amy had spoken to her about the molestation before this litigation began.

When asked if anyone had reported the molestation to the police, Susan responded that "they tried to go to an attorney, Bufkin, and he told them it was past the statute of limitations." She, also, confirmed that since Amy's mother, Barbara Fruge, found out about the allegations, she and her brother, Jeff, have been "at odds with each other."

Next, instead of calling Jeff to refute the allegations, Patrick claims that he should have the benefit of a presumption that the allegations are false because Amy would not waive her patient/client privilege, which would have permitted her health care providers to testify.

4

*WAIVER*

"Failure of a party to call a witness creates a presumption that the witness' testimony would have been unfavorable;"[3] however, Amy is not a party to this litigation. She is a witness. Patrick provides no case law, and indeed we find none, that a non-party's failure to waive privilege creates a presumption in a party's favor.

Patrick argued that Susan could have forced Amy to waive her privilege, however, we fail to see how she had the power to do this anymore than Patrick did, and the law does not hold a party to that standard.

We note that, although Susan met her more probable than not burden of proof without the benefit of the presumption, technically, she should be afforded the presumption that Patrick failed to call Jeff as a witness because his testimony would have been unfavorable to Patrick's position. In other words, Susan had the initial burden of proving that, more probably than not, unsupervised visitation would not be in Jordan's best interest. She did this through Amy's testimony that Jeff had molested her when she was a minor. Then, the burden of proof shifted to Patrick. Nevertheless, he put on no evidence refuting her testimony, although, the perfect person who, presumably, could have done so was Jeff.

*CONTRADICTIONS IN AMY'S TESTIMONY*

Additionally, instead of calling Jeff to refute these allegations, Patrick asserts that because there are internal contradictions in Amy's testimony, essentially, we should discount her entire testimony and affirm the trial court's judgment.

The first contradiction Patrick urges is that "[d]espite declaring that she had actual contact with the alleged offender's genitalia, she was unable when challenged to say if he was circumcised or not."

Amy testified she only had direct contact with Jeff Murphy's penis once and it was in the middle of the night, when the lights were off, and she was facing away from him. She said that "[h]e took my left hand and put it on...the shaft of his penis...." Then, she gave a very graphic description of what his penis felt like to the touch. Given this testimony, we do not find her inability to say whether he was circumcised to be a contradiction.

---

[3]*Patton v. Lemoine*, 00-765, p.7 (La.App. 3 Cir. 11/2/00), 776 So.2d 513, 517, *writ denied*, 01-320 (La. 4/12/01), 789 So.2d 591.

5

Second, Patrick notes a contradiction because he contends that Amy testified inconsistently when asked why she first began seeing her therapist. Responding to the question, "[W]hat would you have seen [the therapist Brenda Roberts] for," Amy responded, "Depression, related to being molested." Patrick points out that Amy began seeing Dr. Roberts before Jeff allegedly molested her. Indeed, she testified later in her deposition that she was depressed before the events occurred and, initially, that she had gone to Brenda Roberts for the depression.

We agree that this is an apparent contradiction, however, given her entire testimony and the record as a whole, we do not view it to be significant enough to cast doubt on Amy's veracity regarding the molestation. These events happened a long time ago. She first saw Dr. Roberts around 1981 when she was in the seventh or eighth grade, about 22 years before the deposition. She stated that the molestation began when she was a freshman in high school. At the time of her deposition, she was approximately 35 years old. Moreover, she was forthright in answering Patrick's counsel's extremely sensitive questions unrelated to the allegations, and she provided detailed accounts of her disclosures to others and of the molestation.

After carefully reviewing the entire record, we find no reason in the record for Amy to have fabricated her accounts of molestation. Certainly, the record does not support that she made them for purposes of this litigation. In fact, testifying against a member of her own family, quite possibly, could have severed any hope of an ongoing relationship with her cousins.

Although Patrick's counsel tried to discredit her for behavior in her teenage years, she holds a responsible position as an educator who first began her teaching career in 1993 at W.T. Henning Elementary where she taught preschool special ed. She continued to teach in the Calcasieu Parish public school system until taking her job at St. Margaret's Catholic school where she was teaching the second grade at the time of her deposition in 2003.

We conclude that her unrefuted testimony of the molestation is credible and satisfies Susan's more probable than not standard of proof.

6

*THE BEST INTEREST OF THE CHILD*

Courts possess "inherent power to determine a child's best interest and to tailor a custody order, including visitation, that minimizes the risk of harm to the child."[4] There is no requirement that the child sought to be protected must have already been harmed. For example, in *Harper v. Harper*, the trial court ordered supervised visits for a father even though it found that he had never abused his son but, rather, had abused his other children.[5] Indeed, one court noted that such a requirement "would lead to the absurd conclusion that visitation cannot be restricted for a parent who abused a neighbor's child but has not abused his own child yet."[6] "One can never say that a person is 'cured' of pedophilia, and the success rate in sexual offender cases is extremely poor."[7]

It is common knowledge that sexual abuse is profoundly harmful to a child. In fact, "[t]he State has a compelling interest in protecting children from sexual abuse."[8] The limitation placed on the grandfather in the case at bar is not onerous while the risk to this child is grave. Thus, we conclude that it is in J.M.'s best interest that Jeff Murphy not be allowed unsupervised visitation with her.


**$920.00 AWARD IN COPY FEES**

On appeal, Susan alleges that the trial court improperly issued a judgment, ordering her to pay Black Lake Marsh, Inc. $920.00 in copying fees and interest when it was not a party to this litigation.

Fees were generated when she deposed Patrick's accountant, Scott Sebastien, on August 1, 2002. She compelled him to bring a number of financial records to the deposition. At the deposition, she indicated that she wanted "to attach the whole bookkeeping file, all the[] records to the deposition" and asked him to provide his records to the court reporter for copying. He refused to leave the documents with the

---

[4]*Norris v. Norris*, 604 So.2d 107, 115 (La.App. 2 Cir. 1992).

[5]33,452 (La.App. 2 Cir. 6/21/00), 764 So.2d 1186.

[6]*Norris*, at 115.

[7]*Noe v. Noe*, 93-1316, p. 4 (La.App. 3 Cir. 5/4/94), 640 So.2d 537, 539.

[8]*Folse v. Folse,*98-1976, p.9 (La. 6/29/99), 738 So.2d 1040, 1045.

court reporter, and Susan agreed that he could retain them and provide her with a copy at a reasonable charge.

Later, his office copied the documents and provided them to Susan for $800.00. When she did not pay the bill, his office added $120.00 in interest. Eventually, Black Lake Marsh, Inc., a corporation Jeff Murphy owns, paid the bill, ostensibly "to maintain its professional relationship with the accountants."

In the "P.S." of a letter, which Patrick's counsel addressed to the court, he requested that the judge assess the $920.00 "as a cost of court to be born in its entirety by Ms. Book." In an April 16, 2004 ruling, the trial judge ordered Susan to "reimburse Black Lake Marsh, Inc. the sum of $920.00 for the advancement of payment of the" copying fees and to do so within 30 days.

Susan appealed the rulings, alleging that the trial court could not award a judgment to a non-party to the litigation.

Pretermitting a discussion of whether Patrick's request for these costs was properly pled, we agree that the judgment was improper but for a different reason from Susan's; specifically, Patrick had no right of action to pursue a claim on Black Lake Marsh, Inc.'s behalf.

This court can raise a no right of action exception on its own motion,[9] which we do. "The peremptory exception of no right of action tests whether the plaintiff has the capacity or legal interest in judicially enforcing the right asserted."[10] This exception provides a threshold device, terminating suits brought by one who has no interest in enforcing judicially the right asserted.[11] "Simply put, this exception tests whether this plaintiff, as a matter of law, has an interest and capacity to enforce the claim sued on."[12]

In the present case, Patrick asserted Black Lake Marsh, Inc.'s right for payment. It is not a party to this suit. Therefore, it cannot be afforded a remedy in this action. Accordingly, we find that the trial court's judgment, requiring Susan to reimburse

---

[9]La.Code Civ.P. art. 927; *The Research Group, Inc. v. Sharp*, 430 So.2d 165 (La.App. 2 Cir. 1983).

[10]*Barrow v. Norwest Mortg. Corp*, 02-1935, p.3 (La.App. 4 Cir. 3/26/03), 844 So.2d 52, 54; *Babineaux v. Pernie-Bailey Drilling Co.*, 262 So.2d 328 (La.1972).

[11]*Babineaux,* 262 So.2d 328.

[12]*Succession of Ewing*, 34,413, p.4 (La.App. 2 Cir. 3/2/01), 781 So.2d 885, 889.

Black Lake Marsh, Inc., was improper, and we reverse it.   We assess all costs of this appeal to Patrick.

## CONCLUSION

We conclude that, based on the uncontradicted testimony of Jeff Murphy's sexual misconduct with Amy, a minor, the trial court erred by not requiring supervised visitation with his granddaughter, J.M..   Thus, we reverse that ruling, as well as its judgment against Susan for $920.00, as Patrick has no right to enforce the rights of an entity not a party to this suit.   We cast costs of the appeal against Patrick Murphy.

**REVERSED AND RENDERED.**